**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**TEXARKANA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. 4:97CR40013-001** |
| | ) | |
| **STEVEN WOOLDRIDGE** | ) | |

# GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE

Comes now the United States of America, by and through David Clay Fowlkes, First Assistant United States Attorney for the Western District of Arkansas, and sets forth its Response in Opposition to the Defendant's Motion for Compassionate Release (Doc. 120).

The Defendant, Steven Wooldridge, is currently serving a sentence of life without the possibility of release. The Court imposed that sentence in 1998 following Wooldridge's guilty plea to the offense of kidnapping resulting in death, in violation of 18 U.S.C. § 1201. Wooldridge entered his guilty plea pursuant to a plea agreement in which the United States agreed to withdraw its notice to seek the death penalty against Wooldridge in exchange for his agreement to be sentenced to life imprisonment without the possibility of release, and in exchange for his agreement to waive appellate rights. The Court accepted the plea agreement and imposed the sentence of life without the possibility of release pursuant to the provisions of the Federal Death Penalty Act, including 18 U.S.C. § 3594.

In his motion now pending before the Court, Wooldridge requests the Court reduce his sentence to time served pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). (Doc. 120). In support of his request, Wooldridge states that because of the COVID-19 pandemic, his age of 64 years and his

health conditions place him at a higher risk of severe illness in the event he contracts COVID-19. *Id.*

Wooldridge's motion should be dismissed or denied for any of the following alternative reasons. First, Wooldridge's motion should be dismissed because it falls within the scope of the appellate rights waived in his plea agreement or, alternatively, because his sentence does not come within the purview of 18 U.S.C. § 3582(c)(1)(A). Second, if the Court reaches the merits of Wooldridge's motion under 18 U.S.C. § 3582(c)(1)(A), the Court should deny Wooldridge's motion because he has failed to demonstrate extraordinary and compelling reasons warranting his release. Third, even if the Court finds that Wooldridge has established extraordinary and compelling circumstances, the Court should find that Wooldridge remains a danger to the safety of the community and deny his motion on that basis. Finally, the Court should deny Woolridge's motion after consideration of the factors set forth at 18 U.S.C. § 3553(a), regardless of any other consideration.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On April 11, 1997, Jane Doe[1] was abducted from her home in Texarkana, Arkansas. *See* Postsentence Investigation Report, ¶ 11.[2] Despite an intensive investigation, investigators were unable to develop any leads in the days following Jane Doe's abduction. *Id.* On April 21, 1997, an individual driving in a rural area of a neighboring county noticed three trash bags near the road and took the trash bags to law enforcement. *Id.* The trash bags contained various articles of clothing, which Jane Doe's parents identified as belonging to Jane Doe, and Jane Doe's driver's

---

[1] For purposes of the Government's response, the Government will refer to Woolridge's victim as "Jane Doe."

[2] The Postsentence Investigation Report, which the Court allowed to be filed under seal is attached to the Government's Response as Government Exhibit 1.

license. *Id*. The trash bag also contained items that could be used for restraining a person and a Walmart receipt that showed a purchase of items matching the items of restraint found in the trash bags. *Id*., ¶ 12. The receipt showed that the purchase was made on the morning of Jane Doe's abduction. *Id*. Investigators were able to trace the purchase back to Wooldridge. *Id.*

Upon reviewing Wooldridge's criminal history, investigators learned that in 1992, five years before Jane Doe was abducted, Wooldridge had burglarized a Houston woman's home while armed with a knife and tried to sexually assault the woman. *Id*., ¶¶ 12, 28-29. For that crime, he pled guilty in Texas state court to Burglary of a Habitation with Intent to Commit Theft and was sentenced to eight years in prison. *Id*., ¶ 28-29. He paroled in 1995 and was still on parole at the time of Jane Doe's abduction. *Id*., ¶¶ 28, 31. Investigators also learned that Wooldridge had a prior arrest for criminal sexual conduct with minors. *Id*., ¶¶ 12, 26-27. Investigators then obtained an arrest warrant and arrested Woolridge on April 25, 1997. *Id*., ¶¶ 12-13. In two recorded interviews with investigators following his arrest, Wooldridge confessed that he kidnapped Jane Doe from her home on the morning of April 11, took her to small warehouse in Texarkana, Texas, and restrained her there, and then murdered her that evening in a rural area of Cass County, Texas. *Id*., ¶¶ 13-20. Following his arrest, Wooldridge was initially charged in Arkansas state court.[3]

On September 24, 1997, a federal grand jury in the Western District of Arkansas indicted Woodridge on one count of kidnapping Jane Doe in violation 18 U.S.C. § 1201. (Doc. 9). On November 5, 1997, the grand jury returned a Superseding Indictment that charged Wooldridge with kidnapping and causing the death of Jane Doe in violation of Title 18, United States Code, Section 1201.

[3] The state case against Wooldridge was nolle prossed following Wooldridge's guilty plea and sentencing in this case.

On January 6, 1998, the Government filed its Notice of Intent to Seek the Death Penalty. (Doc. 46).[4] In its notice, the Government alleged it would prove the following factors as justification for a sentence of death under the provisions of the 18 U.S.C. §§ 3591 et seq.:

(1) Wooldridge intentionally killed Jane Doe;

(2) Wooldridge committed the offense of kidnapping and murdering Jane Doe in an especially heinous, cruel and depraved manner in that his offense involved serious physical and psychological abuse of Jane Doe;

(3) Wooldridge committed the offense after substantial planning and premeditation to cause the death of Jane Doe;

(4) Wooldridge was likely to commit criminal acts of violence in the future which would be a continuing and serious threat to society, based on the facts that:

- Wooldridge had committed or attempted to commit other acts of violence, including the attempted rape and assault of a female in an apartment in Houston, Texas in 1992; in the spring of 1997, Wooldridge stalked other female potential victims in the Texarkana, Arkansas, and Texarkana, Texas area; Wooldridge committed multiple burglaries in the same area in the spring of 1997;
- Wooldridge had successfully eluded capture by authorities for a period of time after committing the offense;
- Wooldridge lacked remorse as demonstrated by, inter alia, his admitting that after shooting Jane Doe he felt good about it; that since his arrest he referred

[4] Although this pleading is not available on the online docket, the Government has obtained a file-marked copy this pleading and will seek to have this pleading introduced separately under seal. The Government has provided a copy of the pleading to Wooldridge's counsel.

to Jane Doe and other potential victims in vulgar and insulting sexual terms; and that while incarcerated since his arrest, Wooldridge indicated he would continue to perpetrate such crimes if and when released.

- o Wooldridge killed Jane Doe to prevent her from identifying him as her kidnapper.

(5) Victim impact evidence including: Jane Doe was recently married, was a college student, and was strongly involved with her husband in developing a home and family; and the impact on Jane Doe's family, including their "indescribable horror and revulsion at what was done" to Jane Doe prior to her death.

On February 18, 1998, the United States filed a motion to amend its Notice of Intent to Seek the Death Penalty to add the factor of Wooldridge's committing the offense for pecuniary gain. (Doc. 51).[5] On May 29, 1998, the Court granted the Government's motion. (Doc. 73).

On June 25, 1998, pursuant to a written plea agreement (Doc. 89), Wooldridge appeared before the Court and entered a plea of guilty to kidnapping and causing the death of Jane Doe in violation of 18 U.S.C. § 1201, as charged in the single count of the Superseding Indictment. (Doc. 88).

During the plea hearing, Wooldridge admitted the following facts. (Doc. 100, pp. 19-24).[6] Wooldridge was looking to abduct and assault a female victim. In preparation for his crime, he rented a warehouse in Texarkana, Texas. Around mid-morning on April 11, 1997, Wooldridge saw Jane Doe in front of her home in Texarkana, Arkansas. He watched her enter her home after

---

[5] Although this pleading is not available on the online docket, the Government has obtained a file-marked copy this pleading and will seek to have this pleading introduced separately under seal. The Government has provided a copy of the pleading to Wooldridge's counsel.

[6] Doc. 100 is the transcript of the June 25, 1998, plea hearing.

she finished working in the flowerbeds of her front yard. After parking his minivan in the vicinity of Jane Doe's home, Wooldridge walked to the back of Jane Doe's home. He carried a knife that was concealed in his coveralls, and he had a sawed-off shotgun in his minivan. He was wearing coveralls and a baseball cap and had removed his false teeth in order to alter his identity. He knocked on the back door of Jane Doe's home, and when she answered, he asked to use her phone, pretending he needed help finding an address.

When Jane Doe turned to get her phone, Wooldridge forcibly entered Jane Doe's home and took control of Jane Doe by placing his knife to her throat. Using threats of physical violence, Wooldridge forced Jane Doe to be wrapped inside a blanket. Wooldridge bound Jane Doe inside the blanket by securing it with cords and a television cable. He then searched Jane Doe's residence.

After completing his initial burglary of Jane Doe's home, Wooldridge restrained Jane Doe with a rope and by threats of physical violence and forced her to leave her home with him. Wooldridge placed Jane Doe in her car and drove her to the warehouse he had rented in Texarkana, Texas. Wooldridge placed Jane Doe inside the warehouse and bound her with ropes and other restraints. Wooldridge then returned to and went inside Jane Doe's home, stole some property, and cleared the home of evidence of his crime. Wooldridge then returned to the warehouse.

At approximately 6:00 p.m. that evening, in response to Jane Doe's pleas to spare her life and to release her, Wooldridge assured Jane Doe that he was going to take her into a rural area where he could release her and then escape before she notified the police. He drove Jane Doe to rural, wooded area in Cass County, Texas. Threatening her with his knife and his 410 shotgun, Wooldridge ordered Jane Doe to walk into the woods, caused her to kneel down with a towel over her head, and instructed her to begin counting to a thousand. As she was counting, Wooldridge killed Jane Doe with a blast from his shotgun. Wooldridge then stole Jane Doe's wedding band

and other jewelry. During the plea hearing, Wooldridge admitted that his confessed intent in kidnapping Jane Doe was for sexual assault and for robbery, and Wooldridge admitted that he knowingly and intentionally killed Jane Doe.[7]

In the plea agreement, Wooldridge affirmed that by pleading guilty to kidnapping and causing the death of Jane Doe, the Court had two sentencing options: life without the possibility of release, or death. (Doc. 89, ¶ 4.a.). The agreement provided that in exchange for Wooldridge's guilty plea and his agreement to be sentenced to life imprisonment without the possibility of release, and in exchange for his agreement to waive appellate rights, the Government agreed to withdraw its notice to seek the death penalty against Wooldridge and to concur in the Court's imposition of the sentence of life without the possibility of release, provided the Court accepted Wooldridge's guilty plea and the plea agreement. *Id.*, ¶¶ 8, 10, 13. The plea agreement also provided that if the Court accepted the plea agreement, there would be no need for a presentence investigation as Wooldridge's sentence would be life imprisonment without the possibility of release, and Wooldridge and the Government accordingly asked the Court to sentence Wooldridge immediately upon the Court's acceptance of Wooldridge's guilty plea. *Id.*, ¶ 13. In describing the provisions of the plea agreement to the Court, the Government stated that, "[i]n essence, [Wooldridge] understands he will never be released from prison, and he normally [sic] and voluntarily agrees to accept the imposition of his sentence." (Doc. 100, p. 12-13).

At the plea hearing, the Court, inter alia, confirmed with Wooldridge that he had signed the plea agreement and that he understood the agreement in its entirety. (Doc 100, p. 16). The Court also confirmed with Wooldridge that he understood the consequences of the appellate waiver

[7] In two recorded interviews with investigators following his arrest, Wooldridge provided many graphic details, not recounted at the plea hearing, regarding the commission of his crime on April 11, 1997. *See*, Postsentence Investigation Report, ¶¶ 14-20.

in the plea agreement. *Id*., pp. 16-17. The Court found that Wooldridge's guilty plea was knowingly and voluntarily entered, and the Court accepted it. *Id.*, p. 24. The Court then followed the plea agreement and sentenced Wooldridge to imprisonment in the Federal Bureau of Prisons "for the rest of [his] natural life and shall not be released prior to [his] death for any purpose. *Id.*, p. 30.

On July 1, 1997, the Court entered its Judgment and Order of Sentence. (Doc. 91). In the judgment, the Court stated that the sentence was "imposed pursuant to Title 18, United States Code, Sections 3591 through 3594, particularly Section 3594." *Id.* The judgment reflected that the Court sentenced Wooldridge to life imprisonment without the possibility of release and committed Wooldridge to the custody of the Federal Bureau of Prisons "to be incarcerated for the rest of his natural life and shall not be released prior to his death for any purpose." *Id.*

## II. ARGUMENT

### A. The Court should dismiss Wooldridge's motion.

In his plea agreement, and in exchange for the Government's withdrawing its notice to seek the death penalty, Wooldridge agreed to accept a sentence of life imprisonment without the possibility of release, and he agreed to an appeal waiver that included "all rights set forth in" 18 U.S.C. § 1291, 18 U.S.C. § 3742, 18 U.S.C. § 2255, and any habeas corpus proceeding. The Court accepted Wooldridge's plea agreement and sentenced him to life imprisonment without the possibility of release pursuant to the provisions of the Federal Death Penalty Act, and in particular 18 U.S.C. § 3594. Wooldridge's motion should be dismissed for any of the following reasons.

A defendant's right to appeal is not a constitutional right but is " 'purely a creature of statute.' " *United States v. Andis*, 333 F.3d 886, 889 (8th Cir. 2003) (quoting *Abney v. United States*, 431 U.S. 651, 97 S. Ct. 2034, 52 L.Ed.2d 651 (1977)). Regarding Wooldridge's pending

motion, Wooldridge's right to appeal from an adverse decision would rest on 18 U.S.C. § 1291, which grants courts of appeals jurisdiction of appeals from "all final decisions" of the district courts of the United States. 18 U.S.C. § 1291; *see e.g.*, *United States v. Pawlowksi*, 967 F.3d 327, 329 fn. 4 (3rd Cir. 2020) (citing 18 U.S.C. § 1291 as basis for appellate jurisdiction over defendant's appeal from denial of motion brought pursuant to § 3582(c)(1)(A)(i)); *United States v. Carpenter*, 2020 WL 4601147, at * 1 (9th Cir., Aug. 11, 2020) (unpublished) (same); *United States v. Springer*, 2020 WL 3989451, at * 1 (10th Cir., July 15, 2020) (unpublished) (same).

Wooldridge's appeal waiver in this case was broad: he waived "all rights" under 18 U.S.C. § 1291. At Wooldridge's plea hearing, the Court emphasized the finality of Wooldridge's plea agreement and sentence by ordering that Wooldridge "shall not be released prior to [his] death for any purpose." (Doc. 100). Wooldridge might argue that his appeal waiver should not be enforced because he could not have anticipated that the First Step Act would amend 18 U.S.C. § 3582(c)(1)(A) to permit federal inmates to file sentence reductions motions directly with the sentencing court. But with a broad appeal waiver, subsequent legal developments that benefit a defendant come within the scope the waiver. *See e.g.*, *United States v. McGraw*, 571 F.3d 624, 630-31 (7th Cir. 2009) (observing that "we have consistently rejected arguments that an appeal waiver is invalid because the defendant did not anticipate subsequent legal developments"). Here, Wooldridge's appeal waiver carved out no exceptions and, thus, the Court should dismiss his motion based on that waiver.

The Court should also dismiss Wooldridge's petition because Wooldridge agreed to be sentenced (Doc. 89, ¶¶ 4a., 8-9, 12), and the Court sentenced Wooldridge (Doc. 91), pursuant to the Federal Death Penalty Act and in particular 18 U.S.C. § 3594, which provides for life

imprisonment "without the possibility of release." *See* 18 U.S.C. § 3594. Wooldridge received the sentence he bargained for, and his motion should be dismissed for that reason.

Wooldridge's motion should also be dismissed because sentences imposed pursuant to the Federal Death Penalty Act, and in particular pursuant to18 U.S.C. § 3594, clearly fall outside the purview of 18 U.S.C. § 3582(c)(1)(A). There is no reason to believe Congress impliedly repealed the phrase "without the possibility of release" under 18 U.S.C. § 3594 when it passed the First Step Act, any more than Congress through the First Step Act impliedly amended 18 U.S.C. § 3594 to permit prisoners under a sentence of death the opportunity to avail themselves of 18 U.S.C. § 3582(c)(1)(A). In other words, to interpret Wooldridge's § 3594 sentence, and consequently his pending motion, as falling within the purview of § 3582(c)(1)(A) would produce an absurd result. Such an interpretation would also fail to give effect to the § 3594's plain language of "life without the possibility of release." For any and all of the foregoing reasons, the Court should dismiss Wooldridge's motion.

**B. If the Court reaches the merits of Wooldridge's motion, his motion should be denied.**

If the Court reaches the merits of Wooldridge's motion, the Court should deny his motion for any of the reasons explained below. Wooldridge seeks release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), and it is his burden to show that release is appropriate. *United States v. Johnson*, No. 4:00-cr-40023, 2020 WL 1434367, at *1 (W.D. Ark. Mar. 24, 2020). Under § 3582(c)(1)(A)(i), a court "may" reduce a defendant's sentence if the court, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," finds that "extraordinary and compelling reasons warrant such a reduction," and if the court also finds that "such a reduction

is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i).[8]

The Sentencing Commission's policy statement for 18 U.S.C. § 3582(c)(1)(A) appears at U.S.S.G. § 1B1.13.[9] In Application Note 1, the policy statement describes the circumstances that constitute "extraordinary and compelling reasons" under § 3582(c)(1)(A)(i) as follows:

> (A) Medical Condition of the defendant.
>
> (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (ii) The defendant is—
>
> (I) suffering from a serious physical or medical condition,
>
> (II) suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

---

[8] Prior to the First Step Act of 2018, only the Director of the Bureau of Prisons could bring motions for compassionate release on behalf of inmates under § 3582(c)(1)(A). Section 603 of the First Step Act of 2018 amended § 3582(c)(1)(A) by allowing federal inmates to file such motions directly "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). The Government does not contest that Wooldridge has exhausted administrative remedies.

[9] Congress directed the Sentencing Commission to describe what circumstances would authorize a court to order compassionate release. Specifically, 28 U.S.C. § 994(t) states that the Sentencing Commission "shall describe what should be considered extraordinary and compelling reasons for sentence reduction" under § 3582(c)(1)(A), "including the criteria to be applied and a list of specific examples." The statute also states that "rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t).

(B) Age of the defendant--The defendant

(i) is at least 65 years old;

(ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and

(iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) Family Circumstances.--

(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

(ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D) Other Reasons--As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

U.S.S.G. § 1B1.13 cmt. n.1.

Additionally, § 1B1.13(2) prohibits a court from reducing a defendant's sentence unless the court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

**A. Wooldridge has failed to establish extraordinary and compelling reasons under § 3582(c)(1)(A)(i).**

**(1) Medical Conditions**

As the basis for his motion to be released, Wooldridge cites to his age of 64 years old, diabetes, hypertension and cirrhosis of the liver for the basis of his request to be released. Wooldridge's Medical Records have been filed under seal in this case. (Doc. 120, Exhibits A & B). On August 28, 2019, he saw Dr. Ahmed. The medical record indicates his glucometer readings were reviewed and "they show "good control of DM (Diabetes Mellitus). (Doc. 120, Ex. A, p.

10). On that same date, the medical record indicated he was assessed with "Hypertension, Benign Essential." Merriam-Webster online dictionary defines "benign" as "of a mild type or character that does not threaten health or life."

(https://www.merriamwebster.com/dictionary/benign?utm_campaign=sd&utm_medium=serp&utm_source=jsonld (8/9/2020)).

His record indicates he was prescribed Lisinopril 30 MG Tab for hypertension. *Id.*, p. 12.

Wooldridge's medical record regarding January 17, 2019, reflects that he had no symptoms of heart failure but to monitor for the development of any heart failure symptoms. *Id.* at 252. It also reported that:

Blood pressure remains poorly controlled, but he admits that he does not routinely take his medications and he did not take them this morning. I recommend compliance with his antihypertensive regimen with a target systolic pressure less than 130. *Id.*

Wooldridge's medical record of February 4, 2019, reflects that he had not being compliant with Lisinopril, but has been taking since his consult. (Doc. 120, Ex. A., p. 43). Wooldridge's medical record of February 14, 2019, reflects that he had only been taking ½ tab of Lisinopril and blood pressure readings had been elevated. *Id.* at 39. On April 4, 2019, Wooldridge reported he had started taking the full 30mg dose of Lisinopril as directed since his last blood pressure check. His blood pressure was recorded as 115/64 on that date. *Id.*, at 35. WebMd.com reports normal blood pressure is less than 120/80.

(https://www.webmd.com/hypertension-high-blood-pressure/qa/what-is-normal-blood-pressure#:~:text=A%20blood%20pressure%20reading%20has,doctor%20how%20to%20lower%20it (8/9/2020)).

**2) Present Conditions at Greenville FCI**

His Motion indicates there are only six reported cases of Coronavirus at Greenville FCI where he is designated. Wooldridge's release plan is to live with his daughter in La Porte which is in Harris County, Texas. The COVID-19 Level is severe in Harris County with 34,203 active cases on August 7, 2020. *See*, Exhibit 2, Harris County Public Health Web Page, August 7, 2020. (https://publichealth.harriscountytx.gov/Resources/2019-Novel-Coronavirus).

There is no indication that potential exposure to COVID-19 in the Greenville FCI is greater than that generally found in Harris County, Texas. Courts have also held that generalized concerns about potential exposure to COVID-19 are not sufficient to justify compassionate release. *See United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020). ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release[.]") *United States v. Eberhart*, No. 13-CR-00313-PJH-1, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) ("General concerns about possible exposure to COVID-19 do not meet the criteria for extraordinary and compelling reasons for a reduction in sentence set forth in the Sentencing Commission's policy statement on compassionate release, U.S.S.G. § 1B1.13."); *see also United States v. Clark*, No. CR 17-85-SDD-RLB, 2020 WL 1557397, at *5 (M.D. La. Apr. 1, 2020) (quoting *Eberhart*); *United States v. Zywotko*, No. 219CR113FTM60NPM, 2020 WL 1492900, at *2 (M.D. Fla. Mar. 27, 2020) (same).

Additionally, the BOP's response to the pandemic militates against a finding that Wooldridge has established extraordinary and compelling reasons. The BOP began planning for potential coronavirus transmissions in January 2020 by establishing a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control ("CDC") and World Health Organization ("WHO"). On March 13, 2020, the BOP announced that it was

implementing the COVID-19 Phase II Action Plan in order to minimize the risk of COVID-19 transmission into and inside its facilities. The Action Plan comprises many preventive and mitigation measures, including the following:

- **Screening of Inmates and Staff:** All new BOP inmates are screened for COVID-19 symptoms and risk of exposure. Asymptomatic inmates with a documented risk of exposure will be quarantined; symptomatic inmates with documented risk of exposure will be isolated and tested pursuant to local health authority protocols. In areas with sustained community transmission, all facility staff will be screened for self-reported risk factors and elevated temperatures. (Staff registering a temperature of 100.4 degrees Fahrenheit or higher cannot enter the facility).

- **Quarantine Logistics:** All BOP institutions established quarantine areas within their facilities to house any inmates found to be infected with or at heightened risk of being infected with coronavirus pursuant to the above-described screening protocol.

- **Suspension of Social Visits and Tours:** The BOP placed a 30-day hold on all social visits and tours.

- **Suspension of Legal Visits:** The BOP placed a 30-day hold on legal visits, with exceptions permitted on a case-by-case basis.

- **Suspension of Inmate Movements:** The BOP ceased the movement of inmates amongst its facilities for at least 30 days, with exceptions for medical treatment and other exigencies.

- **Modified Operations:** BOP facilities modified operations in order to maximize social distancing.

On March 18, 2020, the BOP implemented Phase III of the Action Plan maximizing

telework for locations that perform administrative services. All cleaning, sanitation, and medical supplies were inventoried, and sufficient supplies were available and distributed to facilities as necessary. The BOP placed additional orders for supplies, in case of a protracted event.[10]

Phase IV of the Action Plan was implemented March 26, 2020.[11] Pursuant to Phase IV of the Action Plan, the BOP revised and updated its quarantine and isolation procedures to require all newly admitted inmates, whether in a sustained community transition area or not, be assessed using a screening tool and temperature check. Asymptomatic inmates are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation.

On April 1, 2020, in response to a growing number of quarantine and isolation cases, the BOP implemented Phase V and directed the following actions be taken immediately to further mitigate the exposure and spread of COVID-19:

- For a 14-day period, inmates in every institution shall be secured in their cells/quarters to decrease the spread of the virus.
- During this time, to the extent practicable, inmates should still have access to programs and services that are offered under normal operating procedures, such as mental health treatment and education.
- The BOP is to coordinate with the United States Marshals Service to significantly decrease incoming movement during this time.
- After 14 days, this decision will be reevaluated.

---

[10] *See*, https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf (phases I-III).
[11] *See*, https://www.bop.gov/resources/news/pdfs/20200331_press_release_action_plan_5.pdf.

- Limited group gathering will be afforded to the extent practical to facilitate use of the commissary, laundry, showers, telephone, and access to Trust Fund Limited Inmate Computer System (TRULINCS).[12]

Phase VI, implemented April 13, 2020, extended all Phase V measures until May 18, 2020,[13] on which date Phase VII was implement and extended all prior measures until June 30, 2020.[14] These measures are still in effect as the date of the filing of the instant response.[15] In sum, these measures, which include social distancing and quarantine practices, are designed to mitigate the risks of COVID-19 transmission to Wooldridge and others at FCI Greenville as well as other BOP facilities. The BOP's response to the COVID-19 pandemic further undermines Wooldridge's asserted grounds for compassionate release. For all of the foregoing reasons, the Court should find that Wooldridge has failed to establish extraordinary and compelling reasons warranting release under 18 U.S.C. § 3582(c)(1)(A)(i).

**C. Conditions in the community in which Wooldridge proposes to live if his motion is granted.**

Wooldridge's release plan is to live with his daughter in La Porte, Texas. (Doc. 120, p. 15). La Porte is in Harris County, Texas. According to Harris County Public Health, there have been 81,919 confirmed cases and the COVID-19 Level was listed as Severe which is the most dangerous of the possible readings. *See*, Exhibit 2, (https://publichealth.harriscountytx.gov/Resources/2019-Novel-Coronavirus (8/7/2020 at 3:32 p.m.)).

**D. Wooldridge remains a danger to the community under U.S.S.G. § 1B1.13(2).**

Irrespective of COVID-19, U.S.S.G. § 1B1.13(2) prohibits a court from reducing a

---

[12] *See*, https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp. (phases IV-V)
[13] *See*, https://www.bop.gov/resources/news/pdfs/20200414_press_release_action_plan_6.pdf.
[14] *See*, https://www.bop.gov/resources/news/20200520_covid-19_phase_seven.jsp.
[15] *See*¸ https://www.bop.gov/coronavirus/covid19_status.jsp

defendant's sentence under 18 U.S.C. § 3582(c)(1)(A) unless the court finds that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." Under 18 U.S.C. § 3142(g), the Court must consider four factors in determining whether the defendant might present a danger: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g)(1)–(4).

As previously noted, the nature and circumstances of the offense charged are horrendous. Wooldridge is a predator who drove around looking for a woman to abduct and murder. Paragraphs 11 through 20 of the Postsentence Investigation Report, (Ex. 1,¶¶ 11-20) set forth the nature and circumstances of the offense charged, which is the first factor to consider. The weight of the evidence, the second factor, is overwhelming and he entered a Guilty Plea knowing that he would serve the remainder of his life in prison without release.

As to factor three, Wooldridge had a Criminal History Category of III when he was sentenced. (Ex. 1, p. 7). His prior felony convictions include Sexual Abuse of a Child and Burglary of a Habitation with Intent to Commit Theft. *Id.* at pp. 6-7. He has been diagnosed as having an antisocial personality disorder. (Doc. 120. Ex. 1, ¶ 42). Mayo Clinic website[16] defines antisocial personality disorder as:

---

[16] https://www.mayoclinic.org/diseases-conditions/antisocial-personality-disorder/symptoms-causes/syc-20353928 (8/20/2020).

> . . . a mental disorder in which a person consistently shows no regard for right and wrong and ignores the rights and feelings of others. People with antisocial personality disorder tend to antagonize, manipulate or treat others harshly or with callous indifference. They show no guilt or remorse for their behavior.
>
> Individuals with antisocial personality disorder often violate the law, becoming criminals. They may lie, behave violently or impulsively, and have problems with drug and alcohol use. Because of these characteristics, people with this disorder typically can't fulfill responsibilities related to family, work or school.

Wooldridge also has a history of drug abuse. He reported an addiction to methamphetamine, which began at age six, and he was spending approximately $150 to $250 per week toward his drug habit. Although he experimented with marijuana and cocaine, he denied any addiction. (Ex. 1, ¶ 43).

As to factor four, the record establishes that Wooldridge would pose a great threat to the community, especially women, if released. He is a predator who drove around looking for a woman to abduct and kill. He did advance planning as to how he would successfully commit the horrendous crime and avoid capture. Most telling are his admitted thoughts immediately after killing Jane Doe, "That wasn't hard, I will forget about it in a few days." (Ex. 1, ¶ 19).

Wooldridge's Motion refers to the Sentencing Commission's findings that recidivism rates decrease as a person ages. (Doc. 120, p. 13, fn. 6). The Sentencing Commission Report, The Effects of Aging on Recidivism Among Federal Offenders, indicates that other factors effect recidivism. Rearrest rate of persons 60 years or older with Criminal History Category III, was 25.5% when compared to 11.3% for persons 60 years or older with Criminal History Category I.[17]

Consideration of the four factors leads to the conclusion that Wooldridge is a danger to the

[17] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf, Page 25, Fig. 22.

safety of any other person or the community. Wooldridge admitted to committing an extremely violent crime, abducting a woman while holding a knife to her throat, keeping her a prisoner for several hours, and then executing her with a shotgun blast in a remote area. Releasing Wooldridge would create a serious danger to the community.

**E. Wooldridge's motion should be denied under the applicable § 3553(a) factors.**

Even if Wooldridge had established extraordinary and compelling reasons warranting release, he has failed to establish that his release is warranted under the § 3553(a) factors, which are to be considered independent of any other consideration. *See, e.g., United States v. Chambliss*, 948 F.3d 691, 693-694 (5th Cir. 2020) (although defendant's terminal illness of advanced-stage liver cancer qualified as an "extraordinary and compelling reason" warranting release under § 3582(c)(1)(A)(i), consideration of § 3553(a) factors justified denial of release); *see also, United States v. Kincaid*, 802 F. App'x 187, 188-89 (6th Cir. 2020) (unpublished) (although defendant's terminal diagnosis of metastatic liver cancer constituted an extraordinary and compelling reason warranting release under § 3582(c)(1)(A)(i), the district court's discretionary application of the § 3553(a) factors justified denial of defendant's compassionate release motion).

In Wooldridge's case, consideration of the § 3553(a) factors requires denial of his motion for release. The horrendous nature and circumstances of Wooldridge's crime against Jane Doe cannot be overstated and justify his sentence of life without the possibility of release. Wooldridge committed his crime against Jane Doe after having already committed a violent crime against another woman and after having committed sexual crimes against minors. Wooldridge showed no remorse for crime against Jane Doe and by his admission thought nothing of it.

The sentence imposed on Wooldridge reflected the seriousness of his offense, and the sentence was, and remains, necessary to protect the public from Wooldridge's demonstrated

likelihood of committing future violent crimes. The sentence remains a just punishment for the magnitude of Wooldridge's crime. In sum, consideration of the § 3553(a) factors require that Wooldridge serve the remainder of his natural life in prison with no possibility of release.

## III. CONCLUSION

For the foregoing reasons, the United States prays this Court deny Wooldridge's motion for release and for all other relief this Court deems appropriate.

Respectfully submitted,

DAVID CLAY FOWLKES
FIRST ASSISTANT UNITED STATES ATTORNEY

By:

/s/ Claude S. Hawkins, Jr.

Claude S. Hawkins, Jr.
Assistant U.S. Attorney
Arkansas Bar No. 77062
414 Parker Avenue
Fort Smith, Arkansas 72901
Telephone: 479-783-5125
E-mail Claude.Hawkins@usdoj.gov

## CERTIFICATE OF SERVICE

I, Claude S. Hawkins, Jr., Assistant U.S. Attorney for the Western District of Arkansas, hereby certify that on August 24, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following:

Anna M. Williams, attorney for the Defendant

/s/ Claude S. Hawkins, Jr.

Claude S. Hawkins, Jr.
Assistant U.S. Attorney